May it please the Court. In Dolan, the Supreme Court stated that, quote, the City's goal of reducing flooding hazards is laudable, but there are outer limits to how this may be done. A strong public desire to improve the public condition will not warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. That's because the Takings Clause, as the Supreme Court said in another case, was designed to bar government from forcing some people alone to bear public burdens, which in all fairness and justice should have been borne by the public as a whole. In this case, the City of Houston applied a never-before-used regulation to deny DMACC a repair permit in a way that ended all beneficial economic use of DMACC's property, thus imposing on the individual landowner the costs that should have been borne by the public. The Court should reverse and remand for determination of just compensation. Turning to our Lucas total takings claim, unlike the multi-factor Penn Central test, the one and only question under Lucas is whether Arbor Court had any economically viable use after the City's permit denial. The District Court stated at page 6011 that he was, quote, not persuaded that no other economically beneficial use remains. Whether that was a factual finding or a legal conclusion, it was reversible error under the applicable standard of review. Indeed, the District Court quoted at page 5998 the City's expert as saying that, quote, the highest and best use of this property is to hold it for future development until there is such a time that development becomes feasible, end quote. But he never identified when that time would be or what the use would be in the future. The City's expert agreed, quote, there was no identifiable economically feasible redevelopment for that property. That's page 7615. The City's expert went on to testify that the value of the Arbor Court property was entirely derived from the land. That's at page 7615 as well. This is the very essence of a property that was required to be kept economically idle or in its natural state. Just what the Supreme Court said was a total taking under Lucas. And the reason why there was no economically viable use, again, both parties' witnesses agreed, it's because the cost was prohibitive to demolish all of these 15 buildings and then to redevelop it in a way that would be elevated to 6 to 8 feet under Chapter 19 of the Flood Ordinance. Mr. Street, what does the record show that it would have cost to elevate the buildings as you just said? It was $30 to $40 million. That was both in the testimony of our appraiser and in the testimony of Mr. Hickock, who was the principal of DMACC. Mr. McCaslin, who was the City's housing director, was also asked about that. And he said it would be cost prohibitive and economically unfeasible to redevelop anything at that elevation. And that's at page 6853 to 56 in the record. Now there is no case that rejects a Lucas claim where neither the court nor the government could identify any economic use, much less a case where the government's own expert admitted that there was no economically beneficial use. So if the district court's conclusion was a factual finding, it was clearly erroneous. It's possible it was infected by legal error. The district court talked about the possibility of selling the property. It talked about the possibility of holding it for future development and suggested that possibly those could be uses under Lucas. That's simply contrary to Lucas and its progeny. For a sale to be a use, there has to be a buyer that could put the property to an economically beneficial use. But here the evidence was categorical that whether it was DMACC or another buyer or anyone else, there was no use for that property that was economically feasible. And so we're in the situation, like the case of Lost Tree Village out of the Federal Circuit or Del Monte Dunes out of the Ninth Circuit, where the property had some residual value, all property has some value that you could sell and take a flyer on as a speculation. But unless there's some underlying economically beneficial use, a sale itself cannot defeat a Lucas. So isolate for me again the specific record references for that there is no economically viable use of the property. Sure. So 7614 through 15, that's the city's own expert admitting that there's no economically beneficial use and that the entire value of the property is land, that the highest and best use is to hold it. Those were direct quotes that I was giving you. And then DMACC's expert testified to the same effect at 7001 and 7011. These are all cited in our Lucas section of our opening brief. And then Mr. McCaslin testified, the city's housing director, at 6853 to 56. On the possibility of holding for future use, it's a very similar analysis. If you hold it and you have some reason to believe there may be a use in the future because of an economic development or perhaps a regulatory development, then if you can concretely testify to some economic use at some point in the future, perhaps that could be a use. But again, we don't have that here. We have the city's own expert saying, sure, hold it, but I have no idea when it would ever be valuable or when you could ever use it. So I think that's why in the city's brief they fall back to the idea that there was some residual value and they take the position that Lucas stands for the rule that unless the property is totally valueless, that it's not a Lucas taking. That's simply incorrect. In fact, the district court did not rely on that at all. The city's essentially asking for an alternative ground for affirmance. The district court did not say there's residual value and therefore there's no Lucas taking. You can see that at page 6011, his findings of fact and conclusions of law. Instead, the district court found that there was residual value of $500,000 to $1,000,000 and he did not tie that to any particular use. As I've mentioned, the record contradicts any particular use. So that's just residual value that cannot defeat a Lucas claim under the Lost Tree Village case. Mr. Street, I seem to recall in the city's brief, the argument is made that the tax day flood of 2016, there was a determination that the apartments were not, I think, substantially damaged is the term, not over 50%. And yet in the subsequent flood, there was a finding that they were substantially damaged and so therefore the flood ordinance required these repairs to be made. What is your reaction to that? Is that correct? Is that a reason for finding that the ordinance has been validly applied here? So after the tax day flood, two of the buildings were substantially damaged and the city issued repair permits anyways. And of course, that caused us to plow more investment into the property. Our bank extended us a mortgage, HUD renewed the contract for 20 years and increased the rental payment. So we have all of this investment backed expectation flowing in at that time based on the idea that you will get a repair permit. After Hurricane Harvey, the city began to go through the process of making a substantial damage determination, but it was not able to conclude that there was substantial damage. You can read that in our facts section of our brief. The city went back and forth and ultimately the district court found at 5982 to 83 that the city was not able to make a substantial damage determination. So it did not rely on that section of the flood ordinance in denying the permits. Instead it relied on section 1919, which has to do with protecting life and property, which is a section that had never before applied to deny a permit. And even after Hurricane Harvey, DMACC was the only property to which section 1919 was applied. That's again reflected in the district court. Okay. So that's my misunderstanding. Are you saying that a section 1919 determination is separate, distinct from the sort of substantial? Yes. Section 1919 is what the city relied on when it could not make a substantial damage determination. It sort of fell back to this generic, what they viewed as an authority, but which had never been interpreted or applied in that way before. And in fact, the city's witness testified that he had no guidance on how to even make a determination of danger to life or property under section 1919, because it had never been applied before. Now we're getting more into the Penn Central prong of the analysis. Really the reason by which the city stripped all of our economic use of the property is completely immaterial to Lucas, but Your Honor's questions do go to the Penn Central analysis, so I'll turn to that. In Penn Central, of course, there are three factors that the court considers. And the district court found for DMACC on the first factor, which is the degree of economic impact, the city does not challenge that finding on appeal. So there's already one factor going in our direction. We only need to flip one of the other two remaining factors to get a reversal. And I'll start with the one where I think the error is just the most purely legal and evident, and that is the factor which is character of the government action. The district court found that that factor weighed in favor of the city for one reason and one reason alone, and that was because the city, he found that the city acted to promote health and safety and did not act pretextually. That was the end of the analysis. That was legal error. The city's motivation or purpose for engaging in a regulation does not put a thumb on the scale in favor of the government. In fact, the takings clause by its very text presumes that the city is acting for a proper public purpose. And the Supreme Court finally got around to recognizing this and correcting this in the Lingle decision, where it said that a proper public purpose is irrelevant to whether there's a taking that deserves compensation. Instead, it reiterated that under the character prong of Penn Central, the proper question is the severity of the government's burden on the property owner and how that burden is allocated across other property owners. If the district court had asked that correct legal question, it would have reached a different result. And I'll just pause there for a moment to note that the 11th Circuit in the South Grandview case of 2021 recognized that Lingle took government purpose and motivation out of the character analysis, and we would urge the court to do the same. Again, if the district court had looked at the proper question, it's really undisputed that the severity of the burden here was great. This undisputedly ended an existing use completely, even if you don't buy the Lucas argument that it ended all uses. It certainly ended this existing use completely. It ended affordable housing at that property, which had existed there for decades. So this is not some modification of the use. This is not some marginal burden on the cost of the use. This is a severe deprivation. And we know that DMACC was the only, or Arbor Court, was the only property to which this So this is something where the burden is visited exclusively on one property owner. It's not spread out over a large group of property owners, and DMACC got no benefit from it. This wasn't like a zoning ordinance where DMACC gets benefits from its neighbors not doing dangerous things. So again, we think if you just recognize that legal error and flip that factor, Penn Central leads to reversal. This probably goes back to the Lucas argument, because I guess I've been shuttling back and forth. But I had a question about the HAP contract, H-A-P contract, and about, you can explain it much better than I can, but about how that should or should not be factored into the valuation of the property, if that makes sense. Sure. Yes, Your Honor. So for Lucas, the district court expressly said he did not rely or consider the value of the HAP contract. And that is at page 6,000, footnote 12. And then you can go and read his legal conclusions at 6,011, where he says, I'm ruling against you on Lucas because I'm not satisfied you don't have an economically beneficial use. He doesn't say you've got a multimillion dollar HAP contract, therefore you obviously lose on Lucas. The HAP contract is from HUD? Correct. Correct. What's the premise of the HAP contract? You have to have housing, right, to have a HAP contract? Yes. Yes. You have to provide housing that meets HUD's safety standards. And here HUD wanted this property to be re-inhabited. But when the city denied the permits, then the HAP contract got canceled. And so that's where that came in. But I think if the city, I mean, first of all, again, the district court did not rely on the HAP contract. And we think that was correct. Because the city's argument is essentially like, if the city came and demolished your property in the driveway and it didn't take that, then you must not have had a Lucas taking. Well, no. Those are separate interests. The HAP contract is a separate property interest. So I'll pause there if there are any other questions. Okay. Mr. Strude, I suspect we'll see you back on rebuttal in a few. And Mr. Hightower, whenever you're ready. May it please the court. The fundamental problem with the appellate's argument here is it completely ignores any mention, any involvement of the National Flood Insurance Program. But for the National Flood Insurance Program, we wouldn't have the regulations that we're here to talk about. And DMAC Arbor Court would have never received any benefits after the Tax Day Flood, after Hurricane Harvey. And that's what the National Flood Insurance Program is all about. It's about weighing the benefits of some versus spreading risk and trying to mitigate the loss of flood damage around the country. It's important to keep side of the fact that local and state governments must have some certainty in how to apply the law for the National Flood Insurance Program and how to respond to disasters such as Hurricane Harvey. And they have to be able to predictably apply these regulations in order to qualify their citizens for flood insurance. And for that reason, we would ask that this court should affirm the district court's decision and specifically for three reasons. First of all, the absolute bar provided by this court's prior opinion in Adolph, modified as indicated or perhaps suggested by the district court, shows that, in fact, properly applied NIFP-based rules are not a take-in. And they can't be a take-in. Is Adolph limited to facial challenges? I'm sorry? Adolph limited to facial challenges? I don't believe that it is, Your Honor. The city does not believe that. That's been argued. It's interesting to note that the only objections to the application of Adolph to this case voiced by both appellants and by the district court are the procedural posture, the fact that it was a class-based suit, but the reasoning that it was applied, that was borrowed from a D.C. court circuit case, Texas Landowners, which does, by the way, a great job of explaining the National Flood Insurance Program, has never been attacked, has never been approached, the idea being that health and safety changes the calculus. Flooding insurance, flood mitigation is different, and that's why it requires a different kind of solution. In this case, the National Flood Insurance Program has been around for 50 years. It's interesting to note that no court of appeals has found a take-in. In fact, I'm not aware of a district court case that has found a taking based on the flood regulations, flood control regulations implemented under the National Flood Insurance Program. The program has three pillars. First of all, federally subsidized insurance payments to those who are harmed and whose property is damaged, thereby, second of all, distributed risk, distributed not just through the city of Houston, not just through the state of Texas, but nationwide among all participating communities. And finally, all of this is made possible through the regulations implemented designed to mitigate that risk, to limit development, to limit the repair and reconstruction of properties located within a flood plain or within frequently damaged zones so that those costs don't continue to grow. Now here, it's very clear, DMAC wants the benefits of the flood insurance program. They trumpeted the fact that they received benefits following the tax day flood. They received benefits following Harvey. But what they don't want is to be constrained by those land use regulations that made their participation in the National Flood Insurance Program possible. And it's all part of the same system. If you take away one leg of the stool, the stool falls over because you're no longer trying to mitigate the risk that is covered by those insurance programs. Let me see if I understand your argument. You're saying that there's a federally subsidized flood insurance program that in the, I guess the condition for that are certain flood control ordinances, right? That's exactly right. So are you saying that DMAC qualified for the flood insurance, so it has flood insurance, right? And so when its property was damaged by Hurricane Harvey, it got the flood insurance? So it got paid? I can answer your question, but let me back up just a bit. In order for a community to qualify for flood insurance under the National Flood Insurance Program, the community, the local government is required by federal statute to enact flood control property use regulations such as those captured in Chapter 19 of Houston's Ordinance. They are then qualified, and they may apply for flood insurance under the program, which is what DMAC did, but only because the Chapter 19 flood control ordinance was put in place first. Absent that, no one in the city of Houston would qualify, and it wouldn't be possible at all. And I'm not sure what the private flood insurance part of this is. Are you saying if we found that there was a taking here, all of a sudden Houston wouldn't qualify for flood insurance? I think that it would make things difficult going forward, Your Honor, and your question lies at the heart of our argument. So Section 1919 had never been applied to anybody in this way before Harvey? Is that right? That particular section for the city engineer to deny a permit based on concerns for health and safety had, in fact, not been applied before. That is correct. Okay. Well, the flood insurance program has been around for, what did you say, 50 years? That's correct. 50 years. Okay. 1919 has never been applied but one time and only to this one person. So I still don't understand how the existence of the flood control program means that there can never be a taking. That's what you're arguing, right? There can never be a taking. Well, what I'm saying, this Court said in Adolph, following the reasoning from Texas landowners, that when a local government implements restrictions from land use regulations modeled on those regulations provided by FEMA, through their regulations, that that can't be a taking because they are trying to remediate this flood issue and to provide for the health and safety of the public. Now, the District Court felt that bar was too strong, felt that that bar went too far, and said that while a taking in a situation such as that would likely be rare and only occur in extreme cases where a city abused or improperly applied the ordinance. Here the evidence said exactly the opposite and the District Court was very clear about this in its findings of fact and conclusions of law, saying that while there may have been a property about speaking with HUD about the HAP contract, none of those conversations were used to then influence the city officials that were charged with reviewing the substantial damage determination or ultimately making the decision to deny the permits for rebuilding under Section 1919. There was no connection whatsoever and the Court is very, very clear about that.  Didn't buy your Adolph argument, right? Didn't buy your Adolph argument. That is correct. Okay. So didn't buy it. Then the District Court said, well, it's going to be very rare that there would be a taking associated with a floodplain regulation. That's correct. Okay. Now, where did you get that rule from? It would be very rare that there would be a taking associated with a floodplain. Initially in reviewing the arguments that we had prevented at trial, which began with this Court's decision in Adolph, which, by the way, remains binding precedent in this Court, initially, again, objected to that complete bar and felt that that was inappropriate. And it went through and it reviewed the Lucas taking arguments, it did a Penn Central analysis. But at the end of the Penn Central analysis, the Court circles back and that's when it speaks to the holding in Adolph and that's when it reiterates the fact that to simply the Court was very moved and was very impressed by the idea that the flood control regulation was there to protect the health and safety of the citizens and to protect property. Well, sure. But every time the government does something to take property, it says, I'm doing this to protect the health and safety of the citizens. That's the whole premise. There's got to be a public purpose. Not necessarily health and safety, though. You're correct that the government always has a public purpose. Okay. Some beneficial, something that benefits the public. But the Supreme Court's case law is pretty clear that health and safety issues are sort of taking it at another level. And in the cases that the Supreme Court has considered, even those at Keystone, Bidham and Scull Association, Buclid v. Amber, Goldblatt v. Hempstead, and then some of the Court of Appeals cases since then applying this, health and safety is different. And that is something, that's why the National Flood Insurance Program applied through the city of Houston here in Chapter 19 is different and should be given a different type of review. But as I was saying, coming back to... Well, it seems like you're using this idea in a way to never get to Lucas or Penn Central. Is that right? We would never get to Lucas or Penn Central if we accepted this. That is correct. Okay. If, if the regulations were applied properly and without some level of abuse or . . . Well, I know. But the district court just said that. I mean, I don't know where that comes from. Like, is that just an idea that the district court had? It, it is, Your Honor. Okay. Well, that's fine. I mean, the district judge does have ideas. It is concerned with the absolute bar that was otherwise provided within, within . . . I get it. I get it. He's trying to make sense of . . . He's trying to make sense of the bar that Texas landowners . . . But the city's view is the bar is blanket. It is categorical. It is exception-free. Unless it's abused or improperly applied, that would be correct, Your Honor. If I could continue, in this case, the city also believes there was no categorical taking under Lucas. I'm glad you got to that because you don't have to . . . you can win without this first argument, right? We believe so. You can win. You can win. You can win. That's the quick off-ramp, Your Honor. Well, that's the quick . . . We like to offer you a quick-kill opportunity. Like wide, broad highways. And so, Lucas, I guess the basic question is, what is the evidence that showed there is some beneficial . . . some beneficial . . . some actual viable economic use of this property despite the flood, the application of the Flood Control Ordinance 1919? What is it? What is the beneficial . . . First of all, Your Honor, there was no proof that 100% of the value of the property had been destroyed. Well, it's got to be 100% use, right? The use . . . I . . . What is the use? It can be value. What do you do with this property? Respectfully, Your Honor, it can be value. And I know that there's some disagreement. So, if I sell it at a fire sale, that means that there's no Lucas taking? Not necessarily at a fire sale, no. It can't be de minimis value. Well, what's the value? What would they get if they sell it? Here, the court found that there was between 350 . . . I'm sorry, $3.5 million and $6 million worth of value in the property. They could sell it? $500,000 to a million was based on the land value. The other $3 to $5 million was based on the value of the HAP contract. Well, but the district didn't rely on the HAP contract, and I don't understand . . . I . . . I would challenge the court to go back and look at . . . I disagree with the opposing counsel to say that the . . . If there's not apartments, how could there be a HAP contract? I'm sorry? If there's not apartments there, how could there be a HAP contract? Oh, but the contract remains. In fact, as the findings of fact state, the contract was then moved to another property and . . . So, how could we include in the value of this property, then, if it got moved to another property? I'm sorry? How could we include in the value of this property if it got moved to another property? Well, it's worth noting that the HAP contract was always included in DMAC's arguments to the court in terms of the value at the property. It's also worth noting . . . If we're going to talk about . . . I guess I'll just get back to what's the economic use of the property? What is it? If you got the 1919 applied to it . . . Well, the land is still there, and it's important to note that the only use that was denied . . . Isn't that your first answer, the land is still there? So, the land . . . I just want to know what your answer is. The land is still there. The land is still there, which could be developed. The only development . . . In what way? What would it be developed as? Anything else could be built there of any type as long as it was built above the flood line. That's the only restriction. And, in this case, the only request the City of Houston received was a request for repair permits to basically put it back the way it was. That was not tenable for the reasons cited. And, I would like to point out, there's a lot of discussion about the use of CHAPS Section 1919 versus the substantial damage determination, but I really encourage the court to look at the letter, the denial letter, which is in the record at 82-31-32. In that, the letter is signed by Carol Haddock, who was then the director of Houston's Department of Public Works, but it was actually written by Joe Myers, who was the city engineer. And in it, he lays out specifically, in great detail, what the health and safety concerns were. But, one of the things he points out is, while the city had been trying to perform a substantial damage determination, it could not complete that because despite requests to DMAC to provide certain documentation so that they could complete that, they never got the records. They wouldn't provide them. It was impossible to complete a substantial damage determination. In fact, we only obtained those records through discovery in this litigation. And when we received those, it was patently obvious that the property was 60 to 80 percent damaged. I get it. So, your first answer to me on what is another economic use of this property, a viable economic use, was there's the land itself. That's correct. Was the second one, you could build apartments, but they just have to be above the flood line? You could build anything as long as it was built above the flood line. Okay. Is there any evidence in the record that shows that that's actually economically viable, since we heard that it was something like 30 or 40 million bucks to put these apartments at that level? To put these apartments at that level? I'm not aware of that. Okay. But it's also worth noting, Your Honor, another important piece of evidence as to the value of the property, several weeks after the letter went out denying the permits, DMAC delivered a written offer of sale to the city of Houston saying, we'll sell you the property and the HAP contract for $24.4 million. Clearly at that point, they thought the property was worth $24.4 million. They didn't want to get left holding economically valueless property, right? But that's evidence of their perspective of value of the property. Likewise, there have been tax appraisal protests subsequent to the denial that have said that the property is worth up to $6.5 million. Under Lucas, is there any legal significance to whether doing anything on the property would be prohibitively expensive? Does that fact matter at all under the Lucas inquiry? Lucas specifically dealt with a property that couldn't be developed in any way whatsoever. Mr. Lucas bought beachfront lots that he wanted to develop. They were bare land. The government of South Carolina changed some regulations so he couldn't build anything. There was nothing there. And if he tried to sell it to anybody, they wouldn't be able to do anything with it. So when the Supreme Court in Lucas talks about land being left idle, being left in its natural state, that was literal in the case of Lucas. Does the price tag not matter at all? Does the magnitude of the cost not matter at all? It could matter in a certain sense, but it doesn't mean that it can't be used for anything. And that is the categorical taking. The case law since Lucas that discusses categorical taking says that this is an extraordinary, can only be used in extraordinary cases where the regulation permanently destroys all value. That's how it was articulated in the Tahoe Sierra case. And we just don't have that here. Do you agree? I think it might have been your expert or some expert said one of the economic uses is to hold the property for future. That's correct. That's correct. Are you saying that is an alternative economic use? That could be. And that was based on, that I believe came out of the McLeod case from the night search. I mean, look, to be fair, to be frank, I hear that and I think, oh, okay, so the use of the property is do nothing and hope something changes in the future? Or sell it to someone else. The Nekrolov case discussed that it's possible to sell the property to another party and Nekrolov, I'm sorry. They have costs associated just with holding the property, right? They can't just do nothing. That's correct. That's correct. Do you have anything to add beyond your briefing on Penn Central? I'm sorry? Do you have anything to add today beyond your briefing on Penn Central? I would just say briefly, Your Honor, that with regard to the investment, the spoiling investment expectations, they have to be reasonable investment-backed expectations. And in the Apollo Fuels case, three factors were cited. Did the claimant operate in a highly regulated industry? They admit that it was a highly regulated industry. Was the plaintiff aware of a problem that spawned the regulations? They admit that they were aware that the property when they bought it was in a floodway, in a floodplain, and they bought flood insurance. Then could they have reasonably anticipated the possibility of such regulations being enacted in light of the environmental environment at the time? The regulations had been in place since 2006. And while that is not dispositive, it is informative of the fact that when a Dallas real estate investor comes to Houston, buys an apartment complex on a floodway in Houston along the Gulf Coast, there's risk there that it's going to flood, as evidenced by the fact that they bought flood insurance. Should reasonable investment-backed expectations be informed by HUD saying, yeah, we want to reform this property and continue to give you a HAP contract to have people in this property? Isn't that what HUD is saying? HUD is saying, yeah, yeah, we'll give you a contract for this property. Just make the repairs, and we'll give you a contract, right? I don't think that the record is exactly as it was characterized before. I believe that the renegotiation of the HUD contract was before the tax day flood. But I'm willing to be corrected on that. Well, I mean, I guess just my reaction to that is, all right, yeah, it's in a floodplain, 100-year flood, OK, there's a bad flood in 2016, they repair it. Are their expectations going to be, you know, next year there's going to be an even worse flood? And we're not going to, I mean, is that, you have to factor that in? You have to foresee that? I think that the thing that does need to be, and I'm seeing my time, if it's expired, if I can finish my response. The thing, and the district court hit this pretty hard, was that Hurricane Harvey wasn't just a flood. It wasn't just a devastating flood. It was the second 100-year flood within 18 months, thereby making the property, not just a flooded property, a repetitively flooded property. Yeah, but who could have anticipated that? FEMA through its promulgation of the regulations that stated that this was a 100-year floodplain and it needed to be treated carefully. There are no other questions we would ask that the court affirm the trial court's judgment. OK, Mr. Heisauer, thank you very much. Thank you. We appreciate it. Mr. Street, you're back for rebuttal for five minutes. Thank you, Your Honor. One quick factual correction, then turning to Lucas, and then turning back to the broader questions about the flood insurance program, which do not somehow overrule Lucas before Lucas even happened. In terms of factual corrections, the HUD 20-year contract renewal was after the Tax Day flood. That's records 71-71, 87-55 through 78. Now on Lucas, I didn't hear any economic use identified. Judge Duncan, you suggested that the city's expert said one of the uses was to hold it for future development. It's actually much more striking than that. That expert said, as quoted by the district court at 59-98, the highest and best use is to hold this property for future development. So that's his best take on what you can do with this property. Was there an explanation in that testimony about what we're waiting for in terms of future development of the property? I just, I don't understand that. No, no. It's pure speculation, which Lost Tree Village says a speculative land use is not a use. Now there were some questions about why other uses besides the apartments weren't possible. Again, I think that categorical testimony says that they are not possible, and the reason is that it costs at least $600,000 just to knock down these buildings. So to put up a single house on stilts or a putt-putt golf course or a glass bottom boat, you're not even going to recoup that, and if it's a structure, it has to be elevated. So that's why I think they were so categorical. I think Judge Willett, you asked about, does Lucas take into account those costs that could go along, and I think Lucas in all takings cases take account of the market and the reality. Lucas actually didn't say you can't build any structures. It said you can't build habitable structures, and the footnotes say, well, you could build planks. You know, you could build walkways. So you could charge five bucks and, you know, have a walkway and look at the sea, but obviously that wasn't economically viable. So we heard a lot about the offers to sell and all that. Well, obviously the district court didn't buy that. It said the residual value was $500,000 to $100,000. Now we heard a lot about this is going to bring down the whole flood insurance program. Obviously the district court didn't buy that. Adolph itself is a very narrow holding. It's about a facial challenge that was seeking to bring down the entire flood insurance map, and the court was very clear that the challenges there were having to do with prevention of new construction in the floodplain. Adolph did not address the ending of existing uses in the floodplain, didn't lay a glove on that. So those Penn Central as-applied type challenges are live after Adolph. I think we know that by the Dolan case, which I quoted at the beginning of my argument. Dolan actually involved a 100-year floodplain, and the court, Chief Justice Rehnquist in his opinion there said, obviously if we just said, if the city had just said, give us some property in the 100-year floodplain, that would be a taking. So there's no flood exemption to the traditional takings analysis. There it was exactions, the traditional takings analysis applied. There was no thumb on the scale because it was flood prevention. The only time, and Adolph predated Lucas by several years, so there's no possible way that there could be a flood prevention exception to Lucas, and all you have to do to know that is look at Lucas itself. It's really striking. Footnote 10 of Lucas is the findings of the South Carolina legislature, and it said, to protect life and property from dangerous erosion, we are not going to have beachfront construction. That did not stop the Supreme Court from saying the traditional categorical takings analysis applies. There's no reason to believe flood insurance is somehow different. Now where we do agree is that these challenges will be rare. We don't think it has anything to do with motivation or abuse. That never comes into takings because purpose is presumed, but these are going to be rare because it's going to be a rare case where applying the flood ordinance takes all possible uses and where the government's own witnesses admit that. It's also going to be a rare case where application of the flood ordinance passes muster under what was unusual about this case, and that was that the regulation was applied for the first time. So you had this use existing for decades at this property. You had money being poured into it, and then for the first time, they are hit with this regulation that was unanticipated. Just curious, did DMACC ever receive flood insurance payout? I believe so, yes. I believe that they did, and so there are going to be narrow as applied challenges on the facts of this case. Another amazing fact is the city didn't say Adolph lets us take this property. They said we should really buy out this property. Let's see if we can find the money to buy this out, and they bought out the next door neighbor property. So they knew our investment backed expectations and our expectations of compensation were intact even after Hurricane Harvey. Okay, thank you very much. The court appreciates both sides for their able advocacy today. We appreciate it.